UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 23-cr-324(1) (NEB/LIB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT** |
| v. | |
| DONALD DUANE ARMSTRONG, JR., | |
| Defendant. | |

The United States of America files its response to Defendant Donald Duane Armstrong, Jr.'s (Armstrong) Motion to Dismiss the Indictment. ECF No. 36. In his motion, Armstrong contends that 18 U.S.C. §§ 922(a)(6) and 922(g)(1) are unconstitutional, both facially and as applied to him, based upon *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Armstrong's claim, however, is without merit, and nothing in *Bruen* casts doubt on the ability of Congress to prohibit individuals from lying on ATF forms while purchasing firearms or possessing firearms as felons.[1]

---

[1] Armstrong concedes that his constitutionality attack on 18 U.S.C. § 922(g)(1) is foreclosed by controlling Eighth Circuit precedent. The current law of the circuit, binding on this Court and as Guenther concedes, is *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), which held that 18 U.S.C. § 922(g)(1) is entirely constitutional, without need for resort to any "felony-by-felony litigation." *Id.* at 502. Given this, the Government responds solely to address the constitutionality of 18 U.S.C. § 922(a)(6).

## **INDICTMENT AND RELEVANT PROCEDURAL HISTORY**

A grand jury returned an indictment which charged Armstrong and his co-defendant, Franklin Warren Sam, Jr., in Count 1 with Conspiracy to Make False Statements During Purchase of Firearms, in violation of 18 U.S.C. §§ 371 and 922(a)(6), and Armstrong only in Count 10 with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). The indictment alleges that Sam purchased multiple firearms from Federal Firearm Licensees and, during the purchase, certified on ATF Form 4473 that he was the actual transferee and/or buyer of the firearms. Question 21a asks:

> Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.**

The indictment further alleges that such certifications were false statements because Sam transferred multiple firearms to Armstrong, a convicted felon. Armstrong now challenges the constitutionality of the 18 U.S.C. § 922(a)(6) charge pursuant to *Bruen*.

## A. DEFENDANT'S CLAIM FAILS ON THE MERITS SINCE § 922(A)(6) REMAINS CONSTITUTIONAL EVEN AFTER *BRUEN*.

To the extent this Court considers the Second Amendment's application to § 922(a)(6), Armstrong's claim fails on the merits.

### 1. SECOND AMENDMENT FRAMEWORK

The statute Armstrong has been charged with outlaws the following:

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter

18 U.S.C. § 922(a)(6).

The Second Amendment provides that:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

Fourteen years ago, the Supreme Court concluded that the Second Amendment confers an "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The "central" aspect of this right is the "right to self-defense." *Id.* at 628. The Court

3

noted, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *see also Bruen*, 142 S. Ct. at 2128 (quoting *Heller*). The Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on … laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27*; see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (quoting the same). In fact, according to the Court, such restrictions are "presumptively lawful regulatory measures" and this list is not exhaustive. *Heller*, 554 U.S. at 627 n.26.

The Court recently elaborated on the framework of Second Amendment analysis in *Bruen*. In that case, the Court analyzed the constitutionality of a New York firearm licensing scheme where an applicant was required to prove that he had "proper cause" to carry a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2123. The Court struck down the "proper cause" requirement as too subjective and violative of the Second Amendment. *Id.* at 2156.

In reaching this conclusion, the Court laid out the analytical framework for determining whether a firearm regulation is constitutional under the Second Amendment. Courts "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. To make this assessment, a court must engage in a two-prong

analysis. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does not, the analysis ends, and the Government's regulation is valid.

If the conduct at issue is covered by the Amendment's text, however, the Government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the Second Amendment's protections. *Id.* In conducting this historical analysis, the Court recognized that the Government need not present a one-to-one comparison between regulations in existence during Colonial times and those at issue in the present litigation. *Id.* at 2132. Rather, the Government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era. *Id.* In this way, the test in *Bruen* only requires a showing of a historical example that is "relevantly similar" to the current regulation; the Government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 2132-33 (quotation omitted, emphasis in original). The Court looked at historical precedent before, during, and after the founding. *Id.* at 2131-32.

5

Applying that standard, the Court held unconstitutional a New York licensing law that allowed an otherwise law-abiding applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self- defense. *Id.* at 2134. This, the Court concluded, fell within "the right to keep and bear arms." *Id.* Since the government did not show any applicable historical analogue, the Court found the permissive licensing regime unconstitutional. *Id.* at 2135-56.

The Supreme Court noted, however, that its analysis of New York's discretionary licensing regime did not undermine the constitutionality of 43 states' "shall issue" licensing systems that required no showing of need by the applicants. *Id.* at 2138 n.9. Even though those states had various "narrow, objective, and definite" criteria the applicants had to meet before being given a license to possess a firearm, those criteria were constitutionally permissible because they were "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.; see also Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring) (noting those statutes were

6

"constitutionally permissible" even though they required a "license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among others"). Those statutes could be unconstitutionally applied to an individual applicant and "deny ordinary citizens their right to public carry" if the objective criteria were "put toward abusive ends" and, for example, resulted in "lengthy wait times in processing license applications or exorbitant fees." *Id.* at 2138 n.9. Absent that, however, licensing laws with those minimal objective criteria were constitutional because they did not "necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.*

At bottom, the Court noted that New York's statute was unconstitutional, but it continued to recognize the right to carry firearms in self-defense is still "subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (quoting *Heller*, 554 U.S. at 581).

## 2. SECTION 922(A)(6) IS NOT UNCONSTITUTIONAL BECAUSE IT DOES NOT FALL WITHIN THE SECOND AMENDMENT'S PLAIN TERMS

Armstrong's challenge to § 922(a)(6) fails at the first step of the *Bruen* analysis because the text of the Second Amendment does not cover his conduct

or the statute to which he is charged. This is because: (a) the licensing requirement that Sam and Armstrong conspired to violate does nothing to "infringe[ ]" on the right to bear arms; and (b) Sam—and by extension, Armstrong due to the conspiracy—was not a responsible, law-abiding citizen whose right to bear arms is protected by the Second Amendment. This Court should agree with every district court the Government is aware of to decide the issue and find § 922(a)(6) remains constitutional after *Bruen*. *See e.g., United States v. Ladd,* No. 2:22-CR-057-PPS-APR 2023 WL 4105414 (N.D. Ind., June 21, 2023); *United States v. Soto*, 2023 WL 1087886 (W.D. Tex. Jan. 27, 2023) (finding § 922(a)(6) constitutional); *United States v. Tilotta*, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022).

    a. Section 922(a)(6) does not "infringe[ ]" on the Second Amendment rights.

First, the Second Amendment only proscribes laws that "infringe[ ]" on the protected right to "keep and bear Arms." Nothing in § 922(a)(6) infringes that right. *See, e.g.,* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").

Rather, § 922(a)(6) was not enacted to prohibit individuals from possessing firearms for the lawful purpose of self-defense, but instead it

prohibits a potential purchaser from *making a false statement* to a firearms dealer in connection with a firearms purchase. The Second Amendment right to keep and bear arms "doesn't give a person the right to lie to acquire a firearm." *Graham v. United States*, 2012 WL 6111852 (N.D. Ind. 2012). Stated another way, "the 'conduct' prohibited under § 922(a)(6) is knowingly making a false or fictitious oral or written statement" and that "conduct falls outside the conduct protected by the Second Amendment, that is to 'keep' and 'bear' arms—or as *Heller* established, to 'have' and 'carry' weapons." *United States v. Soto*, 2023 WL 1087886, at *3 (W.D. Tex. Jan. 27, 2023).

Indeed, the Supreme Court signaled that its recent Second Amendment decisions do not implicate the "presumptively lawful" category of "laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-627 & n.26 (observing that "laws imposing conditions and qualifications on the commercial sales of arms" are "presumptively lawful regulatory measures"); *cf. Bruen*, 142 S. Ct at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States 'shall issue' licensing regimes, *** which often required applicants to undergo a background check or pass a firearms safety course."); *id* at 2157 (Alito, J., concurring) (explaining that *Bruen* does not "disturb[]" *Heller*'s

9

statements "about restrictions that may be imposed on the possession or carrying guns"); *id.* at 2162 (Kavanaugh, J., concurring) (finding that "shall-issue licensing regimes are constitutionally permissible" and may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling). *See Huddleston v. United States,* 415 U.S. 814, 824-25 (1974) (regulatory scheme "was enacted as a means of providing adequate and truthful information about firearms transactions"); *see also Abramski,* 573 U.S. at 188 (similar regulatory scheme to ensure the "lawfulness of a gun sale" and that the dealer has sufficient information to check the "true purchaser's identity and eligibility for gun ownership"). Section 922(a)(6) is part of that regulatory scheme.

Armstrong has not identified how knowingly making a false statement about a firearm purchase restricts his Second Amendment right to possess a firearm. Indeed, Question 21a on the ATF Form 4473 does nothing to prevent Sam or Armstrong from obtaining a firearm. That question—and the requirement that the FFL ask the question and require truthful answers—does not restrict a purchaser's right to own a firearm since it is merely a question consistent with the "commercial sales of arms." *Heller*, 554 U.S. at 626-627 & n.26. Rather, it is Sam's lie that matters.

In short, nothing about § 922(a)(6) prohibits Armstrong and Sam from legally procuring a firearm. It prohibits individuals from lying on ATF forms while buying guns. As such, it is not an infringement on Armstrong's Second Amendment right.

    b. <u>Regardless, Armstrong's Co-Conspirator is Not a Law-Abiding Citizen</u>.

Regardless, Armstrong and Sam are not a law-abiding citizens whose right to bear arms is protected by the Second Amendment. As the Supreme Court has made clear, the Second Amendment protects the right of "law-abiding citizens" who may bear firearms for "lawful purposes." *Heller*, 554 U.S. at 625; *accord Bruen*, 142 S. Ct. at 2122 (the Second Amendment right is limited to "law- abiding" citizens seeking to execute a lawful purpose). Here, Armstrong is a felon and Sam was not acting as a law-abiding citizen, but rather law-evading.

As alleged in the conspiracy, Sam made materially false statements on the ATF Form 4473 when he sought to purchase the firearms for Armstrong. He lied about being the "actual transferee/buyer of the firearm(s)." If he would have answered truthfully, the licensed firearms dealers would not have sold him the firearms. In other words, the very inception of the transaction involved a materially false statement, rendering Sam no longer a law-abiding citizen,

and Armstrong—a felon—never having the ability to obtain one in the first place.

While the federal restriction against lying on the 4473 Form will prevent some people from being able to buy firearms, that impact is similar to that of the "shall issue" licensing regimes of *Bruen*, which set up objective criteria that must be met before lawfully possessing a firearm. Those objective criteria were in place "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9. The 4473 Form accomplishes the same goals. In fact, in addition to requiring the buyer's name, some of those "shall issue" regimes require that a buyer provide other information, such as their address when applying for the license and some even put the address on the permit itself.[2] Given those criteria were permissible

---

[2] *Bruen*, 142 S. Ct. 2111, 2123 n.1 (listing regimes); *see* Alaska Stat. §13A-1175 (incorporating § 18.65.170); Colo. Rev. Stat. § 18-12-106 (incorporating § 18-12-205(1)(a)(I)); Fla. Stat. § 790.06(4)(a); Idaho Code § 18-3302(K)(2)(a); 403 ILCS § 66/10(a)(2) (incorporating § 66/30(b)(1)); Ind. Code § 35-47-2-3(e); Iowa Code § 724.7(1) (incorporating § 724.10(1)); Kan. Stat. Ann. § 75-7c03(b); Ky. Rev. Stat. § 237.110(7)(e)(1)(a); La. Stat § 40:1379.3(A)(1); *id.* § (c)(1)(a) (change of address); Me. Rev. Stat. § 2003(1)(D)2); MCLS § 28.425b(1)(a); Minn. Stat. § 624.714(3)(a)(1); Miss. Code § 45-9-101(4)(a); Mo. Rev. Stat. § 571.101(3)(1); Neb. Stat § 69-2430(1); Nev. Rev. Stat. § 202.3657(7)(a); N.H. Stat. § 159:6(I)(b); N.D. Code § 62.1-04-03(6); Ore. Stat. § 166.291(3)(a); 18 Pa. Stat § (e)(3)(i); S.C. Code § 23-31-215(E)(8); S.D. Code § 23-7-7 (incorporating § 23-7-7-1.(6)); Tenn. Code § 39-17-1366(f)(1); Tex. Code § 411.174(b)(3); Utah Code § 53-5-704.5(4)(a); Va. Code § 18.2-308.04(E); Wash. Code § 9.41.070(4); W.Va. Code

under *Bruen*'s analysis, it should be equally permissible under § 922(a)(6) and demonstrate how Sam and Armstrong's conduct does not evince law-abiding conduct such that his lies are entitled to Second Amendment protection. Indeed, Armstrong would be hard-pressed to explain why a state can compel individuals to submit to background checks but cannot require that same citizen to truthfully fill out a licensing form before he can obtain a firearm.

Even those courts that have interpreted the Second Amendment's protections as expanding beyond "law-abiding citizens" have nevertheless acknowledged that the Supreme Court's use of the phrase "law-abiding, responsible citizens" was meant as a "shorthand in explaining that its holding … 'should not be taken to cast doubt on longstanding prohibitions.'" *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023) (quoting *Heller*, 554 U.S. at 626-27. One of those prohibitions includes "laws imposing conditions and qualifications on the commercial sale of firearms." *Heller*, 554 U.S. at 626-27.

---

§ 61-7-4(i); Wyo. Stat § 6-8-104(d)(i). Others have residency requirements, which by their nature similarly would require truthful information relating to address and the actual purchase. Ala. Code § 13A-11-75(a) ("an Alabama resident"); Ark. Code. § 5-73-309(2)(A); Ga. Code § 16-11-129(a)(1); *id.* § (e)(4) (steps for change in address); Mont. Code § 45-8-321(1); N.M. Stat. § 29-19-4(A)(2); Ohio Rev. Code § 2923.125(B) (setting our procedures based on residency); *id.* § (F)(4) (fees based on residency); 21 Okl. St. § 1290.12(A)(7) (requiring State ID); *See also* N.C. Gen. Stat. § 14-415.11(d) (requiring notice of change of address).

Section 922(a)(6) is such a restriction.

### 3. THE PROVISION OF 18 U.S.C. § 922(a)(6) COINCIDE WITH HISTORICALLY-IMPOSED FIREARM REGULATIONS.

Even if Armstrong's conduct (and Sam's role in the conspiracy) was covered by the text of the Second Amendment, his challenge still fails because there have been proscriptions on the commercial sale and transport of firearms since the Founding Era that are identical or, at least "relevantly similar," to the current regulation. *Bruen*, 142 S. Ct. at 2132-33. Courts have recognized that "colonial governments substantially controlled the firearms trade."[3] *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals. A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions' … In the 1800s, three southern states imposed taxes on personally held firearms." Robert Spitzer,

---

[3] States continued to enact laws that "dealt broadly with manufacturing, inspection, and sale of weapons," including "the manufacture, sale, [and] transport" of gunpowder, in the 18th and 19th centuries. Spitzer, "Gun Law History," 80 Law & Contemp. Probs. 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested or 'proved' to insure that they could withstand the firing process without rupturing." *Ibid.* During the same time period, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Ibid.*; *see id.* at 74 n.125.

14

*Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership. Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the established social order."); *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009) ("[T]he Founders did have gun control. They had mandatory musters. Everyone with a gun had to show up and register their firearm").

Similarly, in the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia likewise provided that people were at "liberty to sell armes and ammunition to any of his majesties loyal subjects *inhabiting this colony*." *Id.* at 698 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id.* at 685. Further, and consistent with this Founding Era tradition, States continued to enact laws governing "the manufacture, sale, [and] transport" of

guns and ammunition in the 18th and 19th centuries. *Spitzer,* 80 Law & Contemp. Probs. at 74.

In *Heller*, the Supreme Court specifically provided that its ruling would not call into question regulations on the "commercial sale of arms." *Heller*, 554 U.S. at 627. This example was included in a laundry list of "longstanding" prohibitions that were to be considered "presumptively valid" because of the historical recognition and vintage. *Id.* at 626. And the Court noted that its list was not exhaustive. Section 922(a)(6) is clearly a statute affecting, and relating to, the commercial sale of firearms and such regulations were consistent with laws then in existence during the relevant periods.

In sum, historical sources demonstrate a wide panoply of laws from the Founding Era which required firearm "registration," and which heavily regulated the sale and transfer of firearms. These are historical analogues to the current ATF Forms, which are necessary to, and in aid of, modern legislative schemes regulating the commercial sale of firearms. Even if this Court finds that these are not "distinctly similar historical regulation[s]," *Bruen*, 142 S. Ct. at 2131, it should nevertheless conclude that § 922(a)(6) is "analogous enough to pass constitutional muster." *Id.* at 2133.

## **CONCLUSION**

For the foregoing reasons, the Government requests this Court DENY Armstrong's Motion to Dismiss the Indictment.

Dated: December 29, 2023                                    Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*s/ Evan B. Gilead*

BY: EVAN B. GILEAD
Assistant U.S. Attorney
Bar No.: 1601283 DC