UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 23-324(1) (NEB/LIB)

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

DONALD DUANE ARMSTRONG,

        Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTIONS TO SUPPRESS EVIDENCE**

The United States of America files its Response to Defendant Donald Duane Armstrong's (Armstrong) Motions to Suppress Evidence (ECF Nos. 37-38) and Memorandum in Support Thereof (ECF No. 68). For the grounds set herein, the Government requests this Court deny Armstrong's motions.

## BACKGROUND FACTS

### A.   Procedural Background.

Armstrong is charged in a ten-count Indictment with one count of Conspiracy to Make False Statements During Purchase of Firearms (Count 1), in violation of 18 U.S.C. §§ 371 and 922(a)(6), and one count of Felon in Possession of a Firearm (Count 10), in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. Armstrong filed motions to suppress a statement to law enforcement (ECF No. 37) and evidence he views was unlawfully obtained as a result of search and seizure (ECF No. 38). The Court held a motions hearing on January

9, 2024. ECF No. 64. Minnesota Bureau of Criminal Apprehension (BCA) Special Agent (SA) Michael Dieter testified. Government exhibits 1-4 were entered as evidence. The hearing was transcribed. ECF No. 67. Following the hearing, Armstrong filed his Memorandum in support of his motions to suppress evidence. ECF No. 68.

B.   **Factual Background.**

1.   *The June 12, 2023, Application, Affidavit, and Warrant for Armstrong's Residence, Vehicles, and Person.*[1]

The application and affidavit (hereinafter "application") were authored by BCA SA Dieter. As detailed therein, SA Dieter is an experienced law enforcement officer, having served in the profession for over sixteen years and, at the time of the application, had worked for the BCA since March 2021. Gov't Ex. 1 at 2. Relevant to the facts and charges here, SA Dieter's experience included "criminal street gang investigations as well as firearm investigations." *Id.*

Throughout the probable cause portion, the application detailed facts uncovered by SA Dieter and other investigators which led them to believe Armstrong's residence, vehicles, and person contained evidence for the charged

---

[1]   Gov't Ex. 1.

offenses. First, SA Dieter related that he had been investigating a separate individual—L.L. Daniels (Daniels)—since late-2022 for trafficking in controlled substances and firearms in the Beltrami County, Minnesota area. *Id.* On March 31, 2023, SA Dieter learned from a Minnesota State Trooper that Daniels was a passenger in a traffic stop in Morrison County, Minnesota. *Id.* The Trooper investigating the traffic violation had "located a large quantity of marijuana" and a Glock semi-automatic pistol inside the vehicle, while three cell phones were found on Daniels. *Id.* SA Dieter related that, in his experience, the combination of multiple cell phones, drugs, and a firearm were indicators of drug trafficking, and he took steps to further investigate. *Id.*

On April 5, 2023, SA Dieter, after obtaining a state search warrant, extracted and reviewed data from Daniels's three cell phones. *Id.* Included in the many drug conversations was a conversation between Daniels and "Don Armstrong"—an individual SA Dieter believed and confirmed to be Armstrong. *Id.* at 2-3. Though SA Dieter did not note the date of the conversation, he detailed that Armstrong "sent several photographs of firearms to Daniels and indicated he wanted to sell 3 firearms to Daniels." *Id.* Additionally, Armstrong wanted to purchase THC vape cartridges. *Id.* Based on the information included in the conversation, which included Armstrong's home address, SA

3

Dieter continued his investigation by asking a confidential informant (CI) for additional information regarding Armstrong. The CI advised SA Dieter and another BCA special agent that they knew Armstrong "to possess firearms" and "were aware that Armstrong sells cocaine." *Id.* Further, the CI provided Armstrong's residence and vehicle descriptions, which SA Dieter independently verified during his investigation. *Id.* The CI also advised they had seen Armstrong with "pistols and long guns in the past" and "believed [him to] travel[] in his vehicle with a pistol *on a regular basis*." *Id.* (Emphasis added). SA Dieter advised that Armstrong was prohibited from possessing a firearm at any time because he is a convicted felon. *Id.* Further, SA Dieter provided information which pertained to the CI's reliability, including the fact that the "CI has provided information to law enforcement in the past that has led to the seizure of controlled substances and the arrest of suspects in controlled substance trafficking investigations." *Id.* at 3-4.

Lastly, Armstrong's cell phone toll records indicated that he regularly communicated with a known drug trafficker which, in conjunction with the other evidence outlined in the application, further bolstered SA Dieter's belief that Armstrong's residence, vehicles, and person contained evidence of crime.

As a result of SA Dieter's application and after review thereof, Cass County

District Court Judge Jana Austad authorized the search warrant. *Id.* at 6-8.

      2.   <u>*The June 21, 2023, Application, Affidavit, and Warrant for Armstrong's Cell Phone and Execution Thereof.*</u>[2]

During the execution of Armstrong's residential search warrant,

investigators seized Armstrong's Apple iPhone. Gov't Ex. 2 at 2. To extract and

review data from Armstrong's iPhone, SA Dieter applied for a search warrant.

*See generally* Gov't Ex. 2.  In the application, SA Dieter requested a specific

date range wherein he wanted to search for evidence of Armstrong's crimes:

> Call logs, text messages including SMS, MMS, and test messages/communication through third-party applications, instant messages from social media applications including but not limited to Facebook Messenger, user accounts located in the phone/console, location data, photos, and videos from February 1st 2023 through June 14th 2023.

*Id.* at 1. SA Dieter limited the scope of his request based on the observations

he had made from Daniels's cellphone extraction review wherein conversations

between Armstrong and Daniels started in February 2023. Tr. 24. However,

and in an abundance of caution, SA Dieter advised the court as to a potential—

and in this case realized—eventuality based on his experience with cellphone

---

[2]    Gov't Ex. 2.

extractions and review generally: "that software utilized to extract data cannot exclude content by date[]". *Id.* at 2. Further, that if SA Dieter "observe[ed] content outside of the date range that appears to be evidence of criminal activity, [he] will apply for an additional warrant for the extended date range." *Id.* On June 22, 2023, Beltrami County District Court Judge Jeanine Brand, after reading through SA Dieter's application, authorized the search of Armstrong's iPhone.

At the motions hearing, SA Dieter described his experience sifting through the data obtained from Armstrong's iPhone. After Judge Brand authorized the search, SA Dieter extracted the data from Armstrong's iPhone. Tr.[3] 25. At the time he conducted the extraction, SA Dieter had no knowledge— nor could he—of how much data Armstrong's iPhone contained, including how far back in time Armstrong's criminal conversations occurred. *Id.* SA Dieter reiterated to this Court that he "can't extract just a certain date range from the device[]" but that "[a]ll the data has to be extracted." *Id.* at 25-26. Because the extraction was relatively large, it took SA Dieter hours, over a period of days and while simultaneously working on other cases, to go through the

---

[3] Transcript of Record (Tr.), *United States of America vs. Donald Duane Armstrong, Jr., et al.*, 23-cr-324 (NEB/LIB), District of Minnesota (ECF No. 67).

extraction. *Id.* at 26-27. At some point during his review, SA Dieter started to notice and review data outside of the authorized date range. *Id.* at 28. As he believed the data outside the range was criminal, and as contemplated in the first iPhone warrant (Gov't Ex. 2), SA Dieter applied for a subsequent search warrant with an expanded date range. *See generally* Gov't Ex. 3. Included in SA Dieter's application in Gov't Ex. 3 are two text message conversations between (1) Armstrong and "Danny Boi"; and (2) Armstrong and Franklin Warren Sam, Jr.—Armstrong's co-defendant here. *Id.* at 2-3. SA Dieter related that, after conducting key word searches on July 17, 2023, and because there was no way to cull out data with specific date ranges, he discovered and reviewed these conversations outside the original requested date range. *Id.*; Tr. 30-31. As SA Dieter advised, an extraction "is an all-or nothing proposition." Tr. 34. Significantly, SA Dieter would have been largely unable to check the date a text message was created *before* reviewing the message because review "would have happened almost simultaneously[;] you'd see the messages, and then the date is [ ] to the right of the screen." Tr. 38. SA Dieter was unsure if he reviewed any other conversations outside of the February 1 to June 14, 2023 authorized date range. Tr. 30. Nevertheless, SA Dieter authored an application and submitted it to Judge Brand for review on the

same date (July 17, 2023) he discovered and reviewed the conversations. Judge Brand authorized the expanded scope of Armstrong's iPhone on July 18, 2023. Gov't Ex. 3 at 5-6.

## ARGUMENT

### A.   Armstrong's Objections.

Armstrong moves to suppress evidence recovered after the execution of multiple investigative warrants (Gov't Exs. 1-3). Specifically, Armstrong first alleges that the information which established probable cause in Armstrong's residential search warrant (Gov't Ex. 1) was stale and thus fatal. ECF No. 68 at 5-11. Second, Armstrong alleges that the same application failed to establish the CI's reliability or basis of knowledge. *Id.* at 11-15. Next, Armstrong argues that the application failed to establish a nexus between the allegations of criminal activity and Armstrong's residence. *Id.* at 15-20. Armstrong also argues that the warrant was overbroad. *Id.* at 17. Lastly, as it pertains to the residential search warrant, Armstrong avers that the *Leon* good-faith exception should not save the "litany of defects". *Id.* at 17-19.

As it pertains to search warrants for Armstrong's iPhone contents (Gov't Exs. 2-3), Armstrong argues the warrant was overbroad and that SA Dieter exceeded the scope of the initial search warrant when he reviewed material

8

outside the authorized date range in Gov't Ex. 2. *Id.* at 19-24. Lastly, Armstrong argues that, if the residential search warrant was defective, his June 14, 2023, inculpating custodial statement (Gov't Ex. 4) was fruit of the poisonous tree. *Id.* at 24-25. Neither the law nor the facts support Armstrong's contentions. Each are addressed below.

**B.     The Fourth Amendment.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend IV. To that end, every search warrant must be supported by probable cause, supported by a sworn affidavit, and describe with particularity the place to be searched and the items or persons to be seized. *Id.* The task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the very term implies, probable cause "deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). As the

United States Supreme Court directed in *United States v. Ventresca,* 380 U.S. 102 (1965), because affidavits "are normally drafted by nonlawyers in the midst of haste and criminal investigation[,] [t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Id.* at 108.

A court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment. *Gates*, 462 U.S. at 236 (quotation omitted); a*ccord, Ventresca*, 380 U.S. at 108-109 ("the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants"). If the issuing judge "relied solely on the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quotation omitted). The affidavit must establish a "nexus ... between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307 (1967). There must also be a nexus between the contraband and the place to be searched. *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of

finding useful evidence." *Etheridge*, 165 F.3d at 657. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates,* 462 U.S. at 238-39 (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)).

**1.  <u>Armstrong's Residential Search Warrant was not Based on Stale Information</u>.**

"It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." *United States v. Kennedy,* 427 F.3d 1136, 1141 (8th Cir. 2005). The lapse of time, between the observations of a witness and the issuance of a search warrant "may make probable cause fatally stale." *United States v. Maxim,* 55 F.3d 394, 397 (8th Cir. 1995). However, the Eighth Circuit has "no 'fixed formula' for deciding when information has become stale, but [] consider[s] the nature of the crime being investigated and the property to be searched. "*United States v. Nieman,* 520 F.3d 834, 839 (8th Cir. 2008) (quoting *United States v. Stevens,* 439 F.3d 983, 988 (8th Cir. 2006) (citation omitted)); *see Maxim,* 55 F.3d at 397. Thus, the passage of time alone is "not always the controlling factor," since other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," may also be relevant to the staleness calculus. *Maxim,* 55 F.3d at 397 (citing *United States v. Koelling,* 992 F.2d 817, 822 (8th Cir. 1993)). A court cannot "simply

count[ ] the number of days between the occurrence of the facts supplied and the issuance of the affidavit[.]" *Id.* Most apropos here, "[t]he passage of time between the transactions on which a warrant is based and the ensuing search is less significant when the facts recited indicate activity of a continuous nature." *United States v. Jones,* 801 F.2d 304, 314 (8th Cir. 1986); *see also United States v. Rugh,* 968 F.2d 750 (8th Cir. 1992).

Here, SA Dieter's application was exceedingly clear as to the type of investigation he was pursuing: "an investigation…in regards to trafficking controlled substances *and* firearms[.]" Gov't Ex. 2 at 2 (Emphasis added). SA Dieter related numerous examples which detailed why he believed narcotics *and* firearms would be found on Armstrong's person, his residence, his vehicles, or a combination thereof. First, SA Dieter advised that he had seen a conversation between Armstrong and Daniels—a known drug trafficker— wherein Armstrong offered to sell three firearms to Daniels. *Id.* at 3. In furtherance of such a deal, Armstrong sent Daniels "several photographs of firearms." *Id.* To confirm Armstrong's identity, SA Dieter searched the Minnesota DVS records for the address Armstrong provided to Daniels. *Id.* Further, SA Dieter surveilled Armstrong address to further confirm

Armstrong's identity and the veracity of the information in the text messages. *Id.*

Continuing his investigation, SA Dieter, along with another BCA investigator, met with a CI who had knowledge of Armstrong's criminal activities. *Id.* The CI advised that they knew Armstrong and knew him to possess firearms. *Id.* As discussed *supra*, the CI advised that Armstrong "sells cocaine," "had seen Armstrong with both pistols and long guns in the past and believed [him to] travel[]in his vehicle with a pistol on a *regular* basis," and provided Armstrong's already verified address. *Id.* (Emphasis added). Importantly, SA Dieter established CI's reliability by including the CI's criminal history, the fact that he was being compensated for information provided, that certain information had been corroborated by investigators, and that he had provided reliable information related to other investigations in the past. *Id.* at 3-4. All of this aforementioned information led SA Dieter—and the issuing court—to reasonably conclude that Armstrong possessed narcotics and firearms at the locations sought to be searched.

Armstrong is correct that Gov't Ex. 1's application—and information related by the CI—fails to list dates or times for Armstrong's firearm possession and trafficking. However, the lack of information is not fatal. The

13

Eighth Circuit, as detailed above, has no "fixed formula deciding when information has become stale[.]" *Stevens*, 439 F.3d at 988. In *Kennedy*, the Eighth Circuit held that "information of an unknown and undetermined vintage relaying the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics could quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation." *Kennedy*, 427 F.3d at 1142. However, the Eighth Circuit also distinguished searches for "easily concealed, readily consumable, and highly incriminating narcotics" from searches for firearms. *See Maxim*, 55 F.3d at 397 (information four months old, or even three years old, may supply probable cause for a warrant to search the home of a person suspected of illegal possession of a firearm, due to the continuing nature of the possession offense and the tendency for firearm enthusiasts to keep their weapons for long periods of time); *see also United States v. Neal*, 28 F.3d 1069, 1074 (8th Cir. 1008) ("Information that someone is suspected of possessing firearms illegally is not stale, even several months later, because individuals who possess firearms tend to keep them for long periods of time.").

In his argument, Armstrong relies on *Kennedy* to persuade this Court to reach a like-conclusion. However, *Kennedy* is inapt and readily distinguishable

from the facts before this Court. *See generally, Kennedy*, 427 F.3d 1136. First, the Eighth Circuit there dealt with a *warrantless* search, pursuant to the automobile exception. *Id.* at 1140-41. Additionally, *Kennedy* dealt only with an automobile, whereas here, the search included Armstrong's person, residence, and vehicles. The most notable and striking difference in *Kennedy* was the property sought—exclusively drugs. Given the evidence before that court, the Eighth Circuit held that Kennedy's ex-girlfriend's lack of specific time frame for her knowledge of the location of narcotics was insufficient to support the probable cause for the warrantless search. *Id.* at 1141. In suppressing the evidence obtained from that warrantless search, the Eighth Circuit specifically differentiated—and endorsed—the conduct before this Court. *See id.* at 1142 n.5 ("Where suspected criminal activity is continuing in nature and the property is not likely to be destroyed or dissipated, the passage of time may be less significant."). Here, the property sought included drugs *and* firearms—a property "not likely to be destroyed or dissipated." As such, it was likely such property was still in Armstrong's possession.

Armstrong also takes umbrage at the CI's information which concerned Armstrong's history of drug trafficking and illegal firearms possession. ECF No. 68 at 10-11. First, the CI that SA Dieter spoke with had a history of

providing law enforcement with information which "led to the seizure of controlled substances and the arrest of suspects in controlled substance trafficking investigations." *See United States v. Williams,* 10 F.3d 590, 593 (8th Cir. 1993) (information from a confidential informant is reliable if the informant has a history of supplying reliable information or if the information provided by the informant is independently corroborated). The CI met with SA Dieter and another investigator. *See United States v. Bell,* 480 F.3d 860, 863 (8th Cir. 2007) (informant's reliability and credibility is strengthened if the informant meets with the officer in person and is willing to provide his or her own personal information). Lastly, the CI "knew Armstrong and knew him to possess firearms." Gov't Ex. 1 at 3. In other words, the CI was providing first-hand information. *See United States v. Warford,* 439 F.3d 836, 842 (8th Cir. 2006) ("[T]here is an inherent indicia of reliability in the richness and detail of a first-hand observation." (alteration in original) (internal quotation omitted)). Based on SA Dieter's history with the CI, and the CI's history with Armstrong, it was reasonable for SA Dieter to infer—as well as the issuing judge—that

16

Armstrong currently possessed a firearm and narcotics in his vehicle, person, or residence.[4]

All told, given the unique circumstances here, the ilk of contraband sought (narcotics *and* firearms), staleness should be considered in a different light than a search for solely narcotics or other ephemeral evidence. SA Dieter, relying on evidence obtained from a known drug trafficker's cell phone linked Armstrong, a convicted felon, to narcotics and firearms trafficking. That link was confirmed by a CI who detailed Armstrong's history with firearms and a belief that he regularly traveled with a pistol. The lack of a defined time period is not fatal here, given the evidence of illegal firearms possession and trafficking. As such, Armstrong's motion should be denied as it relates to staleness.

---

[4]     Armstrong contends that SA Dieter's use of the past tense is indicative of the staleness of the CI's information. However, "the ultimate determination does not turn solely upon whether the verbs used by the hearsay informant end in "s" or "ed". Rather, the question of whether information of an indeterminate recency establishes probable cause that contraband or evidence of a crime will be found in a particular location at a particular time "depends on the circumstances of the case," including the crime under investigation and the property sought[.]" *Kennedy*, at 1142.

## 2. __The Application Plainly Established the CI's Reliability.__

It is well established that "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant." *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998) (citations omitted). "The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *Wright*, 145 F.3d at 975 (citations omitted). As discussed *supra*, SA Dieter used a CI to obtain information about Armstrong and included the CI's history of use within the application:

> The CI in this matter has a criminal history to include, two 5th degree controlled substance violations, a 1st degree controlled substance violation and an aiding an offender violation. The CI is cooperating with law enforcement for monetary compensation and has provided information that has been independently corroborated by law enforcement. This CI has provided information to law enforcement in the past that has led to the seizure of controlled substances and the arrest of suspects in controlled substance trafficking investigations.

Gov't Ex. 1 at 3-4. Therefore, the CI's reliability was plainly established, and SA Dieter could have established probable cause with solely the CI's statements and nothing more. However, SA Dieter corroborated aspects of the CI's information, such as (1) the location of Armstrong's residence; and (2) descriptions of Armstrong's vehicles. *Id.* at 3. "If [some] information from an

18

informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Williams*, 10 F.3d at 593 (citations omitted). Like here, "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause." *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (quoting *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001)).

Armstrong argues—but provides no legal rationale—that SA Dieter's failure to "classify him as a confidential *reliable* informant" fails to adequately establish probable cause in this circumstance. There is no requirement that SA Dieter name the CI a confidential reliable informant. Armstrong's argument is technical and "[t]echnical requirements of elaborate specificity […] have no proper place in this area." *Ventresca* at 108. All that is required is to establish the informant's reliability. And establish SA Dieter did. The CI here cooperated in the past, which led to arrests of multiple suspects in trafficking investigations. *See United States v. Gabrio,* 295 F.3d 880, 883 (8th Cir. 2002) (the informant's reliable information on at least two occasions and return of stolen property were sufficient to establish reliability).

All told, SA Dieter's application clearly established the reliability of the

CI in this case. As such, the CI could alone establish probable cause and the Government requests the Court deny Armstrong's motion on this ground.

3. **The Application—and the Very Nature of Illegal Firearms Possession—Established a Nexus Between the Allegations Therein and Armstrong's Residence.**

A search warrant affidavit must establish a "nexus ... between the item to be seized and criminal behavior." *Hayden*, 387 U.S. at 307. There must also be a nexus between the contraband and the place to be searched. *Tellez*, 217 F.3d at 547. "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *Etheridge*, 165 F.3d at 657.

The warrant affidavit established probable cause that Armstrong possessed firearms illegally. As such, it naturally follows that probable cause existed to search what was known to be Armstrong's residence, because "people generally keep [firearms] at home or on their persons." *United States v. Cowling,* 648 F.3d 690, 696 (8th Cir. 2011) (quotations omitted); *see also United States v. Huntington*, No. 20-cr-145 (ECT/BRT), 2021 WL 165112, at *2 (D. Minn. Jan. 19, 2021) (citing *Cowling*, 648 F.3d at 696) ("Thus, when the government has shown probable cause that a defendant illegally possessed a firearm, that showing naturally extends to his residence."); *United States v.*

20

*Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("It was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his residence .... even though the affidavit contained no facts that the weapons were located in the defendant's trailer ...").

As detailed *supra*, SA Dieter's application (Gov't Ex. 1) established probable cause that Armstrong illegally possessed firearms and trafficked in narcotics. As evidenced by the case law, what naturally follows is that evidence of Armstrong's illegal possession of firearms would be found at his residence. Armstrong's reliance on *United States v. Rios-Uscanga* is misplaced. *See United States v. Rios-Uscanga*, Crim No. 16-316 (RHK/KMM), 2017 WL 1534746 (D. Minn. Mar. 13, 2017), *Report and Recommendation adopted by* Doc. No. 59 (D. Minn. Apr. 26, 2017). The fatal flaw in *Rios-Uscanga* was that the agent's affidavit had "no assertion or even suggestion in the affidavit that the residence to be searched is Mr. Rios-Uscanga's home." *Id.* at 3. However here, SA Dieter and the CI related that Armstrong lived at the residence to be searched. Given the distinction, and the presumption effectively provided by the caselaw, the Government requests the Court to deny Armstrong's argument here.

21

4. **The Search Warrant Was Not Overbroad.**

"The Fourth Amendment [also] requires that a search warrant describe with sufficient particularity the things to be seized in order to prevent a 'general, exploratory rummaging' in a person's belongings." *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "To satisfy the particularity requirement of the Fourth Amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *U.S. v. Summage,* 481 F.3d 1075, 1079 (8th Cir. 2007). Where, as here, "the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice." *United States v. Dennis,* 625 F.2d 782, 792 (8th Cir. 1980); *accord, United States v. Horn,* 187 F.3d 781, 788 (8th Cir. 1999). A court cannot decide in a vacuum whether a warrant "fails the particularity requirement." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011), *cert. denied,* 132 S.Ct. 1713 (2012). A court must base its determination "on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Id.*

Armstrong contends that the search warrant application was overbroad because "the warrant authorized a search of [a]ll vehicles located at the property." ECF No. 68 at 17 (internal quotations omitted). Given the circumstances of the case—one that involved drugs and firearms—SA Dieter's request to search all of the vehicles located at Armstrong's residence was entirely reasonable. Conversely, Armstrong's suggestion to this Court—that SA Dieter, prior to obtaining a lawful warrant, enter Armstrong's property so that he can note the registration number of all the vehicles on the property in such a flagrantly impermissible way—is unreasonable and impractical. The general portability of drugs and firearms, coupled with the CI's information that they believed Armstrong regularly carried a pistol in his vehicle, suggests the propriety of including all of the vehicles on Armstrong's property in the application.

In viewing the application in a practical, commonsense manner, and drawing reasonable inferences from the totality of circumstances, given the evidence, SA Dieter was reasonable in his request to search all of the vehicle's on Armstrong's property. Given this, Gov't Ex. 1 was sufficiently particular to satisfy the Fourth Amendment.

### 5. **In Any Event, the *Leon* Good-Faith Exception Applies.**

Finally, and as it pertains to the residential search warrant, Armstrong argues that, "given the litany of defects with [the warrant], the *Leon* good faith exception does not apply." ECF No. 68 at 17. Assuming, arguendo, that the warrant was not valid, SA Dieter wholly relied on it in good faith. As the Eighth Circuit has explained, the *Leon* court noted that there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence." *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *see United States v. Leon*, 468 U.S. 897, 922-23 (1984). Although evidence obtained as a result of the execution of a warrant that was not supported by probable cause is generally inadmissible, *Mapp v. Ohio*, 367 U.S. 643 (1961), "there is an exception for evidence obtained by an officer who relied in objective good faith on a search warrant." *United States v. Koons*, 300 F.3d 985, 990–91 (8th Cir. 2002), (citing *Leon*, 468 U.S. at 922). In *Leon*, the Supreme Court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" 468 U.S. at 922 (citations omitted). The Court's "good faith inquiry is confined to the objectively

24

ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23.

The Eighth Circuit has outlined four situations where an officer's reliance on a warrant would be unreasonable: (1) the officer included information in the affidavit that he knew was false or would have known was false except for his reckless disregard of the truth; (2) the affidavit is so lacking in probable cause that it is objectively unreasonable for the officer to rely on it; (3) the judge failed to act in a neutral and detached manner; or (4) the warrant is so facially deficient that the officer cannot reasonably presume the warrant to be valid. *United States v. Phillips*, 88 F.3d 582, 586 (8th Cir.1996) (citing *Leon*, 468 U.S. at 922). None of these situations apply here.

As discussed *supra*, and incorporated herein by reference, SA Dieter's application plainly established probable cause to support the issuance of the warrant. The information which established probable cause, and provided by a reliable CI, was not stale. There was a nexus between the suspected criminal activity and the places to be searched.[5] The record before this Court shows

---

[5]     Even if this Court found that SA Dieter's application lacked a proper nexus, the warrant should stand. The Eighth Circuit has applied *Leon* "even though the affidavit did not present facts to indicate the existence of a nexus

that SA Dieter's good-faith reliance on the warrant issued militates against the suppression of any evidence obtained. In sum, the Government requests that if this Court concludes the search warrant (Gov't Ex. 1) is not valid, that the *Leon* good-faith exception applies, and any evidence obtained by and through the execution of the warrant be deemed admissible.

**6.** **Given the Residential Search Warrant's Validity, Armstrong's Custodial Statement Should Not Be Suppressed.**

Armstrong contends that his June 14, 2023 custodial statement (Gov't Ex. 4) should be suppressed should the Court find the residential search warrant defective and the *Leon* good-faith exception inapplicable. Based on the arguments discussed *supra*, the Government contends that the residential search warrant is Constitutionally firm. Thus, Armstrong's June 14, 2023 custodial statement is not fruit of the poisonous tree and thus admissible at trial against him.

---

between [a] residence and the suspected contraband." *See United States v. Carpenter*, 314 F.3d 666, 671-72 (8th Cir. 2003) ("As a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence. Given the common sense appeal of this inference, and its acceptance by the issuing magistrate, it was not entirely unreasonable for [the affiant] to believe the inference to be permissible.").

7. **Special Agent Dieter's Complied With the Scope of the Cell Phone Warrant.**

Armstrong contests the execution of the June 22, 2023 search warrant (Gov't Ex. 2) by arguing that (1) the warrant was not sufficiently particular, and (2) SA Dieter exceeded the scope of the warrant when he viewed messages outside of the authorized date range.

First, the Government agrees that the warrant was not sufficiently particular and overbroad. In his application, SA Dieter advised the court that he "respectfully requests the court's permission to extract data from Armstrong's cellular device to obtain further evidence of *controlled substance trafficking and illegal possession/sales of firearms.*" Gov't Ex. 2 at 1. (Emphasis added). However, "a warrant application or affidavit cannot save a warrant from facial invalidity, [but] it can support a finding of good faith, particularly where, as here, the officer who prepared the application or affidavit also executed the search." *United States v. Weber*, 346 F. Supp. 3d 1335, 1346 (D.S.D. 2018) (quoting *United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017)).

For example, in a recent case addressing particularity in the context of physical evidence, the Eighth Circuit analyzed a search of a hotel room and vehicle where the warrant on its face, though mentioning the hotel room and

27

vehicle, only authorized the search of "said person." *United States v. Szczerba*, 897 F.3d 929, 936 (8th Cir. 2018). The warrant also "did not identify the items authorized to be seized during the search, and although it referred to [the] supporting affidavit, it did not incorporate the affidavit by reference." *Id.* The court held that the warrant "lacked particularity, because it did not list the items to be seized or incorporate [the] affidavit," but nonetheless went on to hold that it was entitled to good faith. *Id.* at 937-39. The court underscored that the Supreme Court has "recalibrated [its] cost-benefit analysis in exclusion cases to focus on the 'flagrancy of the police misconduct' at issue," generally refusing to exclude evidence that is only the product of negligence. *Id.* at 938. The court then concluded that "the warrant was not so obviously deficient that any reasonable officer would have known that it was constitutionally fatal," largely based on the facts that the affidavit made clear the types of evidence that would be seized, the affiant supervised the search, and although the affiant "acted negligently," the "application of the exclusionary rule in this case would not result in appreciable deterrence of police misconduct." *Id.* at 938-39.

This Court had occasion to consider similar arguments in *United States v. Roberto Antwan Williams*. *See generally, United States v. Roberto Antwan*

*Williams,* Case No. 21-cr-254 (WMW/LIB), 2022 WL 17812039 (D. Minn. Sept. 9, 2022), *report and recommendation adopted as modified,* No. 21-CR-0254 (WMW/LIB), 2022 WL 17369688 (D. Minn. Dec. 2, 2022). In *Williams,* the Court ruled that the Government was entitled to the *Leon* good-faith exception even when the warrant was facially invalid.

On the issue of particularity, the warrant does specifically identify, in detail, the types of data to be disclosed by Facebook. (Gov. Ex. 2 at bates 372). The warrant form itself does not discuss the crimes under investigation or contain a time limitation, which may raise some questions about particularity and breadth. However, the Court need not reach the merits of these issues, as the warrant is, at a minimum, entitled to good faith under *Leon. Id.* at 11-12. This Court found persuasive that the affiant "not only drafted both the application and the affidavit, but he was also the officer that executed the warrant, and he personally reviewed the material downloaded from the Cell[ebrite] software." *Id.* at 12. Here, SA Dieter did the same; he drafted the application and the affidavit (which contained the particularity absent from the warrant), executed the warrant, and personally reviewed the material. As such, the Government contends that despite the overbreadth of the warrant, the *Leon* good-faith exception should apply.

Further, SA Dieter's execution of the warrant was reasonable. At the outset, SA Dieter informed the court regarding his understanding of how cellphone extraction worked. Specifically, SA Dieter related that he:

> "intend[ed] to review data from February 1st 2023 through June 14th 2023. However, [SA Dieter] knows that software utilized to extract data cannot exclude content by date. If [SA Dieter] inadvertently observes content outside of the date range that appears to be evidence of criminal activity, [he] will apply for an additional warrant for the extended date range."

Gov't Ex. 2 at 2. SA Dieter then began his review of Armstrong's iPhone and, on July 17, 2023—as he anticipated—reviewed data outside of the authorized date range. Tr. 30-31. That same date, SA Dieter applied for another search warrant which incorporated two conversations between Armstrong and others to establish probable cause for the issuing court. Then-Magistrate Judge Katherine Menendez's Report and Recommendation in *United States v. Eggerson* is instructive here. Crim No. 18-CR-110-DWF-KMM, 2018 WL 6520648 (D. Minn. Sept. 27, 2018), *report and recommendation adopted*, 2018 WL 5962481 (D. Minn. Nov. 14, 2018), *aff'd,* 999 F.3d 1121 (8th Cir. 2021). In *Eggerson*, an investigator obtained a search warrant to examine a cell phone for evidence of drug crimes. *Id.* at 1-2. During the search of the cell phone, the investigator saw and seized a video of a firearm which gave rise to the charge

30

of felon in possession of a firearm. *Id.* The court ruled, *inter alia*, that the video of the firearm (even if its seizure was not authorized by the search warrant) was permissible because "officers were allowed to look in the videos and other parts of the phone for evidence of drug dealing." *Id.* at 5. The court further explained, "[t]he fact that what they found was evidence of a gun crime does not render its discovery beyond the scope of the warrant. Law enforcement officers are under no obligation to ignore evidence of a crime, even if that crime is different from the one they originally began the search for." *Id.* In declining to suppress the Government's evidence, the court adopted and extended the plain view doctrine to digital searches. *Id.*; s*ee, e.g.*, *United States v. Mann*, 592 F.3d 779, 784–85 (7th Cir. 2010) (applying plain view doctrine to a digital search); *United States v. Williams*, 592 F.3d 511, 521–22 (4th Cir. 2010) (holding in the alternative that plain view doctrine would apply to the challenged search); *but see United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1170–71 (9th Cir. 2010) (declining to apply plain view doctrine to a digital search); *United States v. Carey*, 172 F.3d 1268, 1272–74 (10th Cir. 1999) (same).

The Government requests the Court to reach the same conclusion here. Prior to reviewing those conversations, and in his application, SA Dieter

acknowledged the possibility of reviewing messages and, if that were to occur, he would apply for a subsequent search warrant—as he did. Gov't Ex. 3. SA Dieter was lawfully in a digital place and discovered extensions of conversations he was authorized to view.  As such, those conversations were in plain view. Based on the content of the conversation, SA Dieter reviewed portions of the conversation outside of the authorized date range and provided the content in his application to establish probable cause for an expanded date range in Gov't Ex. 3.

Additionally, the *Leon* good-faith exception applies here as well. SA Dieter advised Judge Brand of an eventuality and noted his experience with and knowledge of Cellebrite. Judge Brand issued the search warrant (Gov't Ex. 2), and SA Dieter executed it. Based on the proffered procedure SA Dieter provided to the court in his application in Gov't Ex. 2, he applied for and was issued a subsequent search warrant which expanded the scope of the date range. Given the circumstances, SA Dieter was reasonable to rely on the cellphone search warrants (Gov't Exs. 2-3). As such, the Government contends the good-faith exception militates against suppression here.

## **CONCLUSION**

For the reasons set forth above, the Government requests this Court to

DENY Armstrong's Motions to Suppress.

Date: February 22, 2024                          Respectfully Submitted,

                                                 ANDREW M. LUGER
                                                 United States Attorney

                                                 *s/ Evan B. Gilead*
                                                 BY: EVAN B. GILEAD
                                                 Assistant U.S. Attorney
                                                 Bar No.: 1601283 DC