UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-324(1) (NEB/LIB)

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                  **GOVERNMENT'S POSITION REGARDING SENTENCING**

DONALD DUANE ARMSTRONG, JR.,

      Defendant.

Despite being a five-time convicted felon, Donald Duane Armstrong, Jr. (Armstrong) collected 14 firearms, 10 of which he obtained through a conspiracy with his co-defendant. Included among Armstrong's collection of seized semiautomatics, revolvers, and rifles, investigators located high-capacity magazines and large amount of ammunition. Alone, the number of firearms and ammunition Armstrong possessed as a convicted felon is significant. That many of the firearms were procured through the circumvention of the legal buying and background check process (i.e., straw purchasing) makes Armstrong's crime all the more stunning. Armstrong's criminal conduct necessitates a lengthy, but appropriate period of imprisonment and supervision. Accordingly, the United States recommends the Court sentence Armstrong to 41 months' imprisonment, followed two years of supervised release. Considering the relevant sentencing factors set forth in

18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary.

## I. Offense Conduct.

The offense conduct is adequately described in the PSR (¶¶ 6-13), and the Government is prepared to adopt them at sentencing.

## II. Sentencing Guidelines Range.

On April 16, 2024, Armstrong pleaded guilty to Count 1 of the Indictment which charged him and his co-defendant (Franklin Warren Sam) with Conspiracy to Make False Statements During the Purchase of Firearms. The parties disagree as to the application of the applicable Guidelines.[1] The Government contends that the base offense level for Armstrong's crime is 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(B). Additionally, the Government believes that a four-level enhancement applies pursuant to U.S.S.G. § 2K2.1(b)(1). The defendant disagrees with both and believes that the base offense level is 14 with no additional enhancements. The objections are discussed below.

---

[1] Because of the parties' disagreement over the applicable Guidelines range, which is both factual and legal, the Government intends to request an evidentiary hearing. To the extent facts are different here than at any eventual evidentiary hearing, the Government requests the Court, should it grant such a hearing, rely on the facts elicited from witnesses and adduced from the evidence at any hearing.

A. *The Appropriate Base Offense Level is 20 Pursuant to U.S.S.G. § 2K2.1(a)(4)(B)*.

Pursuant to U.S.S.G. § 2K2.1(a)(4)(B), a base offense level of 20 applies when a defendant is a prohibited person at the time he possessed firearms, and the firearm was capable of accepting a large capacity magazine. Count 1 of the Indictment, which Armstrong pleaded to, describes an ongoing conspiracy between Armstrong and Sam to obtain one firearm—to wit: a Glock model 23 Gen 5 40-caliber semiautomatic pistol—through their false statements to a particular firearms dealer. However, Count 1 of the Indictment alleges—and the Government intends to prove—that there may be other "overt acts."

At Armstrong's change of plea hearing, Armstrong admitted salient facts which are relevant to the Court's consideration here. First, Armstrong admitted that the purpose of his conspiracy with Sam was to purchase the firearm. ECF No. 91 at 2. The reason Armstrong needed Sam to purchase the firearm was for one reason and one reason only; because Armstrong was legally prohibited from possessing—and therefore—purchasing the firearm for himself. Thus, the very necessity and purpose of the conspiracy is predicated on Armstrong's status as a convicted felon. In other words, there would be no need for this conspiracy *but for* Armstrong's status as a felon.

Additionally, Armstrong admitted to certain relevant facts at his change of plea hearing and in his plea agreement. First, Armstrong admitted that law

3

enforcement lawfully seized 14 firearms from his home. "Along with the firearms, the defendant possessed a large amount of ammunition and high-capacity magazines." *Id.* at 3. Lastly, at least for purposes here, Armstrong admitted that 10 of the 14 firearms seized from his property were purchased by Sam.

[I]n the absence of more explicit instructions in the context of a specific guideline," U.S.S.G. § 1B1.3 comment. (backg'd), the district court determines adjustments to a defendant's offense level, including any enhancements, on the basis of what is called relevant conduct. *See* U.S.S.G. § 1B1.3. The term "offense" means "the offense of conviction and all relevant conduct ... unless a different meaning is specified or is otherwise clear from the context," U.S.S.G. § 1B1.1 comment. (n.1(H)). Since no other meaning for the word "offense" is specified here or is otherwise clear from the context, the general provisions governing relevant conduct determine the application of this enhancement. *United States v. Cole*, 525 F.3d 656 (8th Cir. 2008).

The definition of relevant conduct includes:

(a)(2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction...

USSG §1B1.3(a)(2).

4

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." USSG §1B1.3(a)(2), comment. (n.5(B)(i)). Although offenses may not qualify as a common scheme or plan, they may qualify as part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." USSG §1B1.3(a)(2), comment. (n.5(B)(ii)).

In this particular case, Sam and Armstrong repeatedly conspired for the purpose of continuously supplying Armstrong with firearms, and specifically the 10 firearms seized from Armstrong's residence on June 14, 2023. The common scheme, plan, and purpose was for Sam to use his false statements to purchase firearms *for* Armstrong *because* Armstrong was a convicted felon. In this context, it matters not when the false statements or firearm procurement occurred, they are relevant conduct for the offense of conviction. *See e.g., United States v. Mahone*, 688 F.3d 907, 909-10 (8th Cir. 2012) (Defendant's pattern of unlawfully possessing firearms over course of several months constituted same course of conduct for relevant conduct purposes.); *United States v. Goodson,* 920 F.3d 1209 (8th Cir. 2019) (district court's application of two-level increase under §2K2.1(b)(1)(A) appropriate

where two firearms were located during search of defendant's residence and defendant admitted to handling different firearm one month prior.).

To apply a base offense level of 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), and in addition to Armstrong's status of a prohibited person, the Court must determine whether large-capacity magazines were present. Armstrong has readily admitted that large-capacity magazines were seized during the execution of the search warrant on June 14, 2023. The Government's case corroborates the same. During the search, dozens of photographs were taken of everything of evidentiary value, including the location of the firearms and large-capacity magazines:



Most of the firearms, including the Glock 23 Gen 5—circled above—were located in a safe. Also, in the safe—and also circled above—were large-capacity magazines. *See* U.S.S.G. § 2K2.1 cmt. n. 2 (the large capacity magazine must have been attached or "in close proximity" to the firearm at the time of the offense). Because relevant conduct controls here, and is not restricted to only the Glock 23 referred to in Count 1 of the indictment, a base offense level is appropriate here and the Government requests the Court overrule Armstrong's objection.

### B. *A Four-Level Enhancement for Number of Firearms is Appropriate*.

Armstrong's remaining objection pertains to the application of a four-level enhancement due to the total number of firearms Armstrong possessed for essentially the same rationale he objects to the application of the base offense level—because the additional firearms do not correspond to the offense of conviction. As detailed above, "[w]hen a court determines the number of firearms involved in an offense under USSG § 2K2.1(b)(1), it looks to the relevant conduct section of the guidelines (USSG § 1B1.3(a)(2)) to determine how many firearms come within the same course of conduct or perhaps a common scheme or plan." *United States v. Santoro,* 159 F.3d 318, 321 (7th Cir.1998) (formatting altered and citations omitted). Again, it matters not that Armstrong's charge of conviction makes no mention of the additional firearms. *Cf. United States v. No Neck,* 472 F.3d 1048, 1055 (8th

Cir.2007) (stating that even "[a]cquitted conduct may be used for sentencing purposes if proved by a preponderance of the evidence"); *United States v. Dennis,* 926 F.2d 768, 769 (8th Cir.1991) (per curiam) (holding that the district court did not clearly err when it increased the defendant's offense level for distributing six firearms, pursuant to USSG § 2K2.1(b)(1)(B), even though the defendant was only convicted of possessing one firearm). What matters is whether the possession of the additional firearms constitute relevant conduct. "A defendant need not be charged with or convicted of the [relevant] conduct as long as it could form the basis for a count that would be grouped with the offense of conviction." *Cole,* 525 F.3d at 659. Given that Armstrong's possession of other firearms is a direct result of a continuing conspiracy with Sam, such possession is relevant and the Guidelines analysis should reflect such relevance.

C. *The Balance of the Guidelines Analysis*.

Regardless of the outcome of his objections, Armstrong admitted criminal culpability and, as such, the Government concurs in a downward adjustment to reflect such acceptance.[2] A two-level downward adjustment applies should the Court sustain Armstrong's objections; a three-level downward adjustment applies should the Court overrule them. If Armstrong

---

[2] However, the Government reserves the right to withdraw a motion for acceptance of responsibility should Armstrong frivolously deny or object facts at any sentencing or evidentiary hearing.

is correct, with a criminal history category of II, his advisory Guidelines range is 12-18 months' imprisonment. Otherwise, Armstrong's Guidelines range is 41-51 months' imprisonment.

### III.   The Appropriate Sentence.

The Guidelines range is the start, and not the end, of the analysis. *See e.g., United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors"). The Government has considered the applicable 3553(a) sentencing factors and provides the following as reasons for the Court to adopt the recommendations herein.

While somewhat unsophisticated, the conspiracy was quite effective, resulting in Sam straw-purchasing 10 firearms for Armstrong over a one-year period. There can be no doubt that straw-purchasing firearms is a very serious crime which allows otherwise prohibited persons like Armstrong—often because of prior felony convictions, drug addiction, or being a domestic abuser—avoid national background checks and obtain a deadly weapon with impunity.

In addition to the 10 firearms Armstrong conspired with Sam to obtain, he also possessed four others. Such large-scale procurement of firearms by a

9

convicted felon begs the question, "why"? Here, the Government is not only concerned with the sheer number of firearms Armstrong illegally possessed, but his apparent need to possess them in connection with large-capacity magazines and hundreds of rounds of ammunition. While it's true that Armstrong was not actively using any of the firearms, it is equally true that generally one does not possess or carry a firearm if they are not prepared to use it.

Additionally, Armstrong is not naïve to the criminal justice system. While he has no convictions for crimes of violence, he has amassed ten misdemeanors and five felony convictions. His illegal possession of firearms here is the most severe criminal offense to date. And while Armstrong has never served more than 120 days imprisonment, this marked escalation of criminal behavior—one in connection with more than a dozen firearms—is deserving of a graduated sentence. It is clear from his repeated and escalating criminal conduct that a significant sentence is warranted to protect the public from Armstrong's recidivism.

It is also critical to note that Armstrong's criminal conduct has not been stymied by Court supervision and leniency. Between 2007 and 2009, while on supervision for carrying a pistol without a permit, Armstrong violated the terms and conditions of his probation numerous times. PSR ¶ 33. Between 2010 and 2017, while on supervision for a third-degree drug sale conviction,

Armstrong again flaunted the rigors and strictures of probation by violating the terms and conditions at least three times. PSR ¶ 35. This trend continued during Armstrong's supervision in his two 2011 felony theft and fleeing police officer convictions. *See* PSR ¶¶ 38, 40, 42. Such behavior strongly indicates that a significant sentence is necessary to deter Armstrong from committing future crimes and to promote respect for the law.

It is also both an understatement and—unfortunately—stated all too often that we live in a society where gun violence is the norm. Our District and communities have been inundated with gun violence for a number of years now. The reasons for this precipitous rise and maintained normalcy are, of course, multifactorial. To be clear, Armstrong is not the reason for our District's gun violence issues. However, Armstrong's crimes involve the conspiring to obtain firearms through false statements, the result of which is Armstrong's illegal possession of multiple firearms as a convicted felon. The current backdrop and crisis of our community cannot be ignored. Individuals like Armstrong, who cannot purchase a firearm legally due to their restricted status, fuel demand for the illegal trade, purchase, or procurement (through auto thefts or home burglaries) of their firearms. Where there is demand, the supply chain will provide. And our community suffers.

Standing alone, this Court should not tolerate Armstrong's behavior. Given the District's struggles with gun violence, the protection of the

11

community against those who illegally possess firearms creates a renewed urgency to appropriately punish those who attempt to procure and illegally possess firearms. A sentence of 41 months' imprisonment creates the possibility of specifically deterring Armstrong. Such a sentence also sends a message to the public that reflects the seriousness of the offense and promotes a stand against the continued illegal possession of firearms.

After Armstrong is released from imprisonment, the Government recommends the Court utilize supervised release as a tool to address Armstrong's recidivism. Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

To the point, Armstrong's record and conduct on supervision has been relatively poor and demonstrates the need for an appropriate supervised release period. The Government's recommendation of two years' supervised release will provide Armstrong with the necessary supervision during his transition from prison to society in the hopes that he finally becomes a

productive and law-abiding citizen. A structured environment provided by U.S. Probation could also decrease Armstrong's chances of recidivism. In the absence of any positive behavioral changes, lengthy supervision can adequately inform the Court and potentially provide further public protection. Part of Armstrong's struggle has been, and will likely remain, his substance abuse issues. *See* PSR ¶¶ 75-77. Additionally, it appears that Armstrong is currently suffering through untreated mental health issues. PSR ¶ 71. To help address such difficult issues, and for the purpose of successful supervision, the Government is supportive of the supervised release conditions outlined in the PSR. PSR ¶¶ 110-116.

## CONCLUSION

All told, 41 months' imprisonment, followed by two years' supervised release adequately accounts Armstrong's criminal conduct. Lastly, such a sentence accomplishes federal sentencing goals and is sufficient, but not greater than necessary.

Dated: August 14, 2024              Respectfully Submitted,

                                    ANDREW M. LUGER
                                    United States Attorney

                                    /s/ *Evan B. Gilead*
                                    BY: EVAN B. GILEAD
                                    Assistant United States Attorney
                                    Attorney ID No.: 1601283 DC